[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The parties were married in Iron Mountain, Michigan on December 28, CT Page 2058 1957. Three children were born to the plaintiff wife during the marriage all of whom have reached their majority. However, the oldest daughter Elizabeth, now 38 years old and who is working on her Master's degree, is living with the plaintiff ("wife") in the family home located at 156 Mariomi Road, New Canaan, Connecticut. The parties have lived separate and apart since the end of January of 1996 when the husband moved out of the house. The case was filed with the court on May 15, 1998 (return date June 23, 1998) and has had a long and tortuous road to a trial.
The wife is 64 years old. She has suffered from a variety of aliments, including polio as a child, however, these conditions have not significantly restricted her ability to work. In 1955 she received a Bachelor of Science in Physical Medicine from the University of Wisconsin. She has had a history of work throughout the marriage, with some time off to bear and raise the three children, and for significant periods she has been the greater wage earner. She began her employment as a physical therapist and worked for a time both at the University of Wisconsin General Hospital and the Hines Veteran's Administration Hospital in Chicago. She also worked for the cerebral palsy hospital in Durham, North Carolina. In addition, while in Kansas City, she was the director of the physical therapy department at Bethany Hospital. It was at this time that she also had a spinal fusion. From late 1959 until the birth of their daughter Elizabeth in 1962, she was an editor with the AMA in Chicago. In addition to her duties as editor, she took courses in medical journalism at the Northwestern School of Journalism at night. While she did not obtain a degree, she did work at home on a free lance basis. Later on, she moved to Ann Arbor while her husband was enrolled in the graduate school at the University of Michigan. She continued her free lance writing, this time creating five minute daily radio spots. She also testified that at this time she edited text books. Following the husband's obtaining his MBA in finance from the University of Michigan in June of 1963, the family moved to New Canaan, Connecticut, where they rented a home on Cheesespring Road until the spring of 1966. Their son Rhenus was born in 1964. She resumed worked in October of 1966 as a staff editor/writer for a medical journal. She worked at home for about one quarter time, moved up to three quarters time, and later to full time. In addition to her base salary she received bonuses. She was employed by the medical journal Patient Care. The third child, a daughter Sarah was born in April of 1969. She quit work in June and did not work for approximately one year. In 1971 she returned to work again, as a free lance writer producer of medical television videos in New York City. In 1974 she returned to the magazine Patient Care as a senior editor on a full time basis. The magazine had offices in Darien, Connecticut. About 1978 she formed the firm of Alderman and Pauley located at New Canaan. She testified that her husband was very "upset" that she had resigned CT Page 2059 from her position Patient Care. In 1979 the name of her company was changed to Health Communications, Inc. The firm worked in both the video and print. For eight years the firm performed work for Health Systems, Inc., however, her big break came when she began to work in the area of continuing medical education. Periodically she continued to do some work for Patient Care. By 1990 her firm had seven employees and moved the office to 330 Post Road in Darien, Connecticut. Around this time, she sold her interest in Health Communications, Inc. to another corporation and worked for it as an employee. However, this did not work out since the purchaser was unable to meet its financial commitment to her. She then formed Health Communications, LLC. It was also during this period that she approached several large corporations to solicit projects and received her first major contract from Procter and Gamble. According to her testimony, her husband assisted her in the formation of her corporation, however, he was not an active participant in its operations. The current project is over budget and behind schedule, in chief, because she has been unable to concentrate and focus on it as a result the stress and pressure of this long-standing action. She receives between $1600.00 and $1700.00 per month from Social Security and her investments.
The husband is 74 years old. He also has some health problems. Since the age of eighteen he has had limited range with his legs as a result of some trauma which he suffered as a young man. His ankle was fused in 1988. He indicates that he has circulation problems, suffered a broken hip in March of 2000, had open heart surgery in May of 2000, from which he is still recovering. He referred to skin rash and the installation of a new pace maker to replace a 14-year-old one. The open heart surgery replaced an aortic valve. He takes the blood thinner cumadin, a diuretic, blood pressure medicine and ointment for a rash. He indicated that he spends between $150 and $250 a month out of pocket on his drugs, but that he does have Medicare and Medigap Insurance through Anthem Blue Cross/Blue Shield. At the time the parties met, the husband was working for John Hancock as a pension specialist. He took a leave of absence to obtain his MBA at the University of Michigan. Sometime after he returned to John Hancock he lost his job around 1964 or 1965. He was then hired by First National City Band and lost that job also. He got a job with Merchants Bank in Norwalk, Connecticut and was later discharged in 1990. At that time he moved into his wife's office space in New Canaan, to conduct his business on his own, and he worked there until she moved to Darien. While at his wife's office, she made available to him her editors and art directors at no charge. He did pay rent at first but later stopped. The wife testified that he owes $58,000 in back rent. The husband gave her a promissary note for $35,000 which as yet remains unpaid. He occupied two office spaces together with two staff desk CT Page 2060 spaces. The husband has formed an investment advisory firm in part with some former employees from the now defunct Merchants Bank. According to his testimony, the firm manages a $65 million dollar portfolio. Apparently, he draws no salary, but he does get reimbursed his expenses. In addition, his financial affidavit shows income of approximately $1800.00 per month from Social Security and a small pension.
There was some conflicting testimony over the four days of trial regarding the respective contributions of the parties to the various business entities. The wife testified as to substantial financial contributions to the husband's business between 1990 and 1995 from joint income and assets. In addition, the wife testified that the husband wrongfully diverted to his business $35,000 that she had turned over to him with the express purpose to replace a portion of the funds that had been borrowed from one of her retirement savings vehicles. He denied her claim. There came a point in 1995 when the wife, who felt that she had been bearing the financial burden for the house and her business as well as substantial burden for the husband, indicated to him clearly that she needed a contribution from him. She had expressed to him her concerns that her health was deteriorating, and that it was affecting her ability to focus on her projects. The husband indicated that he was doing what he wanted to do and that no contribution from him would be forthcoming. This ultimately precipitated the break sometime later when the husband left the house at the end of the following January.
In addition to their respective businesses, the parties' principal asset is the marital home in New Canaan. The home has a mortgage on it with a current balance of approximately $448,000, and the monthly payments, including real estate taxes, amounts to approximately $4300.00. In addition, the wife received a modest portfolio of stock from her mother, now worth about $200,000, and which has remained in her sole name. In fact she testified that her mother told both her and her husband that the stock was to remain Mrs. Alderman's name alone. She expects an inheritance from her late brother, and, in addition, has saved approximately $190,000 in three IRAs. The wife has an ongoing project for Procter Gamble for which substantial monies have been advanced which is currently in a hiatus. The wife testified that she used much of this advance to live on and that the project, when she resumes it, is likely to wind up substantially in the red, perhaps as much as $200,000. She offered the testimony of an expert witness and their substantial direct and cross examination with regard to this area the court found to be credible. The parties have filed separate tax returns since the separation, and the wife expects a sizeable refund for 1999.
The husband has some life insurance with modest cash values. He CT Page 2061 testified that he cashed in his IRAs to invest in his company. No credible evidence was introduced regarding the value of the husband's pension, however, since he does not seek alimony, it would be logical for the court to infer that each party considers their stream of retirement income, which includes Social Security, as adequate for their respective needs. In addition, no expert testimony was presented regarding the value of the husband's equity interest in Investor's Capital Management, Inc., again however, the court finds that his share does have some tangible value as an interest in a going concern.
The wife testified that the cause of the breakdown of the marriage was a result of the husband's continuous, sporadic and unpredictable outbursts of anger, his verbally abusive and demeaning behavior toward her, as well as his penchant for control. In fact, the court heard testimony that virtually until their separation, the husband managed the family finances with no input from the wife other than her weekly check which she dutifully turned over to him. The court had the opportunity to view the demeanor of both witnesses during the course of the trial, and based upon its observations, the court finds the plaintiff's testimony to be plausible and credible. It is apparent to the court that these two well-educated, very bright people began to go their separate ways both from a career standpoint and from an emotional one long before the filing of the Complaint. The ultimatum issued by the wife in June 1995, and the husband's subsequent move from the family dwelling some months later, was merely the climax of the joyless melodrama that had been their most recent marital state. From the court's perspective, the evidence supports the conclusion that the break up was inevitable at that point after the wife, subservient to the husband throughout the marriage, and who had assumed the greater financial burden for the family, reached the conclusion that she could not continue to do so without the catastrophic collapse of her health and of her finances in the absence of some financial contribution from the husband.
 FINDINGS
The Court, having heard the testimony of both parties, and having considered the evidence presented at hearing, as well as the factors enumerated in Sections 46b-40, 46b-51, 46b-62, 46b-63, 46b-81, and 46b-82
of the Connecticut General Statutes, hereby makes the following findings:
1. That it has jurisdiction.
 2. That the allegations of the complaint are proven and true. CT Page 2062
 3. That the marriage of the parties has broken down irretrievably, and that ample evidence exists that both parties must bear some responsibility for the breakdown, however, based upon the testimony of the wife, which the court finds to be credible, and upon the court's observations of the demeanor of the husband throughout the trial, the court further finds that the husband is primarily at fault.
 4. That based upon the testimony of the parties, each has suffered from and continues to have significant health problems, in particular the husband.
 5. That notwithstanding the length of the marriage and the health concerns of the respective parties, neither party has sought alimony from the other, and that each party has a demonstrated earning capacity and sufficient sources of income from other than employment.
6. That the parties have lived separate and apart since the end of January 1996.
 7. That the fair market value of the marital residence located at 156 Mariomi Road, New Canaan, Connecticut, is $630,000; that the current balance of the existing mortgage is approximately $448,000; and that there is equity of approximately $182,000. The court further finds that both parties contributed to the acquisition and maintenance of the property, but that for some time prior to the separation of the parties, the wife has contributed exclusively to its carrying costs, and, therefore, she is entitled to a somewhat greater share of the net equity.
 8. That during the course of the marriage, the wife established two business entities now known as Health Communications, Inc. (currently inactive) and Health Communications, LLC, and that the evidence demonstrates that the over the course of the marriage up through the date of separation, the husband has made some contribution mainly by the application of his acquired business knowledge and CT Page 2063 experience to the formation of same, but that the wife is the creative force behind the business and she has made virtually the entire effort to conduct business and maintain same, and that it would be equitable and appropriate that she retains her interest therein free and clear of any claim by the husband.
 9. That during the course of the marriage, the husband established a business entity known as Investors Capital Management, Inc., and the evidence demonstrates that, in addition to considerable amounts of joint funds and from joint assets, well in excess of $250,000, the wife has also contributed materially to same, in that inter alia
she provided rental office space and staffing assistance, but that the husband has made virtually the entire effort to conduct business and maintain same; that the husband does have an equity interest therein of undetermined value; and that it would be equitable and appropriate that he retains his interest therein free and clear of any claim by the wife.
 10. During the course of the marriage, the wife inherited a stock portfolio from her mother, the value of which is approximately $200,000. That in addition, the wife anticipates an inheritance from a deceased sibling having a value of approximately $238,000, and that the husband has made no contribution to the acquisition of these assets, and that his contribution to their maintenance and preservation was de minimus.
 11. That the court finds the wife's claim to be credible and supported by the evidence that on or about December 31, 1992, the husband diverted funds to his business which monies were otherwise supposed to be used as a partial reimbursement for an earlier borrowing from the wife's pension account, and that said diversion was inappropriate and amounted to $35,000, and that it would be equitable and appropriate that this is taken into account in the division of the retirements funds of the parties. CT Page 2064
 12. That during the course of the marriage, the wife acquired three IRAs having a combined total value of approximately $190,000, and, in addition, that the husband's financial affidavit indicates that he receives $417.00 per week as and for a "disability/pension" but that no other credible evidence was submitted to the court as to valuation of the husband's interest therein, and therefore, the court further finds that, in light of the fact that each party has some retirement plan in place, and taking into account the husband's diversion of funds from the wife's retirement account, it would be equitable and appropriate that the wives retain her interest in her IRAs free and clear of any claim by the husband and that the husbands retain his pension(s) free and clear of any claims by the wife.
 13. That during the course of the marriage the husband inherited monies from his family amounting to approximately $40,000, which funds were used for the benefit if the family.
 14. That the wife seeks an order of this court awarding her the membership in the New Canaan Lake Club, but that no evidence was presented to the court as to the nature and/or valuation of the interest therein, and that therefore it would be inappropriate for the court to enter any orders regarding it.
 15. That the wife is a part owner with her brother of a parcel of real estate in Ely Township, Marquette, Michigan, which interest is valued at $2700.00, and that the husband has made no contribution to the acquisition, maintenance, and preservation thereof, and the wife is entitled to keep this asset free and clear of any claims by the husband.
 16. That over the course of a forty-three-year marriage both parties have made significant monetary and non-monetary contributions to the CT Page 2065 acquisition, maintenance, and preservation of marital assets, on which contributions it is difficult to place a value, and that while some evidence was introduced regarding specific monetary contributions by each party during the marriage, and that while these were considered by the court in arriving at its decision, that the length of marriage, as well as the ages and states of health of the respective parties were very significant factors.
 ORDER
IT IS HEREBY ORDERED THAT:
 1. The marriage of the parties is hereby dissolved, and they are each hereby declared to be single and unmarried.
 2. Neither party has sought an award of alimony from the other, and therefore no alimony awarded to either party.
 3. The wife shall have exclusive possession of the jointly owned real estate located at 156 Mariomi Road, New Canaan, Connecticut, subject to any existing indebtedness, and she shall be responsible for the payment of all mortgages, liens, taxes, and insurance, and shall indemnify and hold the husband harmless from any further liability thereunder. The parties shall list same for sale no later than June 1, 2001, with a mutually acceptable broker who is a member of the Multiple Listing Service or other similar organization, familiar with real estate values in the New Canaan area, at a mutually agreed upon listing price. If the parties are unable to agree upon a listing price, each shall choose a broker who, in turn shall pick third broker, and the listing price shall be the average of all three brokers. Unless the parties shall otherwise agree, they shall accept any bona fide offer without unusual conditions, which is within 3% of the listing price. Upon sale of the property, from the proceeds shall be paid the customary and ordinary costs associated with a sale of real estate, CT Page 2066 including broker and attorney fees, conveyance taxes, fix-up expenses, and any mortgages and liens. After the payment of these sums, the net proceeds shall be divided 55% to the wife and 45% to the husband.
 The foregoing notwithstanding, prior to listing of the property for sale, the wife shall have the exclusive right to purchase the husband's share of the real property for the sum of $80,000. She must give notice in writing to the husband on or before April 1, 2001, that she intends to purchase his interest in the real property, and she must be prepared to close title within ninety (90) days of her notice to the husband of her intention to purchase. The husband shall, in turn, transfer his interest in the real estate to the wife by means of a fully executed Quit Claim Deed together with a completed conveyance tax form.
 While she occupies same, the wife shall have the sole responsibility for repairs costing $250 or less. Both parties shall share the cost of any maintenance, repairs, or replacements in excess of $250 in the same proportion as their share of the net proceeds. Either party may advance the full cost of same and an adjustment shall be made at time of sale or transfer. Neither party shall further encumber the property nor draw on any home equity without the agreement of the other. The Court shall retain jurisdiction with regard to any conflicts arising out of this issue.
 4. The wife shall be entitled to keep her interest in Health Communications, Inc. and Health Communications, LLC free and clear of any claims by the husband.
 5. The husband shall be entitled to keep his interest in Investors Capital, Inc. free and clear of any claims by the wife.
6. Personal property shall be divided as follows:
 A. With the exception of those items listed on CT Page 2067 Schedule A. attached hereto, which shall be the property of the husband, all other home furnishings and personal property located at the residence at 156 Mariomi Road, New Canaan, Connecticut shall be the property of the wife. Unless otherwise agreed, the husband shall remove any remaining items on said Schedule A within thirty (30) days from the date of this Memorandum of Decision.
 B. Each party shall be entitled to keep the automobile which they are currently driving free and clear of any claims by the other, and each party shall cooperate with the other regarding the execution of any documentation necessary to transfer and/or register same, and each shall indemnify and hold the other harmless from any further liability from any outstanding liens or loans thereon.
 C. Each party shall be entitled to their savings, checking, and money market accounts as shown on their respective financial affidavits.
 D. The wife shall be entitled to keep her stock account containing securities inherited from her mother as shown on her financial affidavit, free and clear of any claims by the husband.
 E. The wife shall be entitled to keep her expected inheritance from her deceased brother free and clear of any claims by the husband.
 F. The wife shall be entitled to keep her interest in the real property in Ely Township, Marquette, Michigan, free and clear of any claims by the husband.
 G. The wife shall be entitled to keep any refunds from her 1999 state and federal income tax returns free and clear of any claims by the husband.
 H. The husband shall be able to keep his existing CT Page 2068 life insurance policies, as listed on his financial affidavit, including any cash values thereon, free and clear of any claims by the wife.
 7. The wife shall be entitled to keep her Individual Retirement accounts as shown on her financial affidavit free and clear of any claims by the husband, and the husband shall be entitled to keep his pension(s) free and clear of any claims by the wife.
 8. Each party shall be liable for the debts as shown on their respective financial affidavits, and shall indemnify and hold the other harmless from any further liability therewith.
 9. Each party shall be liable for the payment of their own attorney's fees and costs incurred in connection with this action.
THE COURT
SHAY, J.
 Schedule A (attachment to Memorandum of Decision)
1. Silver spoons made from Confederate coins; and one large silver spoon.
2. Silverplate items in cabinet in living room — even division, Mary to have first choice.
3. T.V.
4. One corner cabinet in kitchen/family room; the one that does not have the silverplate in it; may remain in house until house is sold.
5. Grandfather clock in living room.
6. Wing chairs in living room; may remain in house until sold.
7. Silver service; wedding gifts from his grandmother.
8. Crystal bowls in living room. CT Page 2069
9. Military prints on wall; may remain until house is sold.
10. Brass candlesticks on mantle.
11. One bookcase from living room when house is sold.
12. Brass candlesticks on bookcase.
13. Two cloisonne ash trays.
14. Brass tray on bookshelf.
15. Books including "The Aldermans in America."
16. Oil painting "Rebecca at the Well."
17. Boar handled fork.
18. Eight silver bread and butter plates.
19. Old Colony sterling silver, monogrammed, from his grandmother.
20. Kirk silver service.
21. One of two Indonesian brass pieces.
22. Two pictures in upstairs hall. One of each daughter.
23. Furniture in master bedroom; may remain until house is sold.
24. Furniture in Elizabeth's room; may remain until not needed.
25. Chest of drawers in attic.
26. One of three mirrors in attic.
27. Cedar chest in attic.
28. Haviland china in china cabinet.
29. Six plates from Silesia, some chipped.
30. Gold top. CT Page 2070
31. Pair crystal candlesticks.
32. Eight crystal water goblets and three crystal wine goblets, clear stem and pink.
33. Linens from his family and some silver items in china cabinet.
34. Crocheted bedspread and some other linens to be selected by Mary.
35. Rosenthal cups and other miscellaneous small items stored in basement.
36. Black gate-leg table in basement.
37. Half of fire wood stacked outside.
38. Any of his year books and diplomas that are found in the house.